# UNITED STATES DISTRICT COURT

for the

Western District of Washington

FILED _____ LODGED
_____ RECEIVED

**02/04/2021**

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY_____ DEPUTY

In the Matter of the Search of                )
*(Briefly describe the property to be searched*   )
*or identify the person by name and address)*    )    Case No.
The Subject Premises described in Attachment A,  )        3:21-mj-05030
including 29628 Gamble Place NE, Kingston, WA   )
98346 and the person of TAYLOR J. JOHNATAKIS    )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
 The Subject Premises more fully described in Attachment A, incorporated herein by reference.

located in the _____Western_____ District of _____Washington_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1512; 111; 231; 271; 372; 2101; 1752; and 40 U.S.C. § 5104 | Obstruction of Congress; Assaulting a federal officer; civil disorders conspiracy; conspiracy to impede/injure officer; interstate travel to participate in riot; unlawful entry; violent entry/disorderly conduct on Capitol grounds |

The application is based on these facts:

✓   See Affidavit of FBI Special Agent Tonya Griffith, continued on the attached sheet.

☐   Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested
     under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

_____
*Applicant's  signature*

Tonya Griffith, Special Agent, FBI
*Printed name and title*

◉ The foregoing affidavit was sworn to before me and signed in my presence, or
○ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date:   2/4/2021

_____
*Judge's signature*

City and state:   Tacoma, Washington

David W. Christel, United States Magistrate Judge
*Printed name and title*

**AFFIDAVIT OF TONYA GRIFFITH**

STATE OF WASHINGTON        )
                                      )      ss

COUNTY OF PIERCE               )

      I, Tonya Griffith, a Special Agent with Federal Bureau of Investigation, having been first duly sworn, hereby depose and state as follows:

### AFFIANT BACKGROUND

      1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 29628 Gamble Place NE, Kingston, Washington 98346 and the person of TAYLOR JAMES JOHNATAKIS (hereinafter collectively, the "SUBJECT PREMISES"), located in the Western District of Washington, further described in Attachment A, for the things described in Attachment B, including any digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the crimes described below, and specifically including any smart phone(s) and/or cellular phone(s) belonging to TAYLOR JAMES JOHNATAKIS (such digital devices being the "SUBJECT DEVICES").

      2.     I am a Special Agent with the Federal Bureau of Investigation and have been since February of 2002. I am currently assigned to the Washington Field Office, Northern Virginia Resident Agency. Since joining the FBI, I have investigated violations of federal law involving organized crime/drug trafficking organizations, extra-territorial criminal and counterterrorism violations, and I currently investigate federal violations concerning child pornography and the sexual exploitation of children. I have gained experience through training and work related to conducting these types of investigations.

1

2     3.      The facts in this affidavit come from my personal observations, my training

3  and experience, and information obtained from other agents and witnesses.  This affidavit

4  is intended to show only that there is sufficient probable cause for the requested warrant

5  and does not set forth all of my knowledge about this matter.

6     4.      Based on my training and experience and the facts as set forth in this

7  affidavit, there is probable cause to believe that evidence, fruits, and/or instrumentalities

8  of violations of 18 U.S.C. § 1512(c)(2) (obstruction of Congress); 111(a)(1) (assaulting a

9  federal agent); 231(a)(3) (civil disorders), 371 (conspiracy); 372 (conspiracy to impede or

10 injure officer); 2101 (interstate travel to participate in riot); 1752(a)(1), (2), and (4)

11 (unlawful entry on restricted buildings or grounds); and Title 40 U.S.C. Section

12 5104(e)(2) (E) and (F) (violent entry, disorderly conduct, and other offenses on capitol

13 grounds) (the "Target Offenses") have been committed by Taylor James Johnatakis

14 ("JOHNATAKIS"), and other identified and unidentified persons, including others who

15 may have been aided and abetted by, or conspired with, JOHNATAKIS, as well as others

16 observed by JOHNATAKIS.   There is also probable cause to search the SUBJECT

17 PREMISES—including JOHNATAKIS's person, wherever he is found—further

18 described in Attachment A, for the things described in Attachment B.  Authority to search

19 the premises described in Attachment A extends to all parts of those premises, including

20 the main structure, garage(s), storage structures, outbuildings, and curtilage, and all

21 vehicles, containers, compartments, or safes located on the property, whether locked or

22 not, where the items described in Attachment B could be found.

23                          **PROBABLE CAUSE**

24            *Background – The U.S. Capitol on January 6, 2021*

25     5.      The United States Capitol Police ("USCP"), the Federal Bureau of

26 Investigation ("FBI"), and assisting law enforcement agencies are investigating a riot and

27 related offenses that occurred at the United States Capitol Building, located at 1 First

28 AFFIDAVIT OF TONYA GRIFFITH - 2
   USAO 20201R00126

1
2  Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on
3  January 6, 2021.

4        6.    At the U.S. Capitol, the building itself has 540 rooms covering 175,170
5  square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228
6  meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S.
7  Capitol Visitor Center is 580,000 square feet and is located underground on the east side
8  of the Capitol.  On the west side of the Capitol building is the West Front, which includes
9  the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded
10 by a walkway, two broad staircases, and multiple terraces at each floor.  On the East
11 Front are three staircases, porticos on both the House and Senate side, and two large
12 skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was
13 barricaded and off limits to the public on January 6, 2021.

14       7.    The U.S. Capitol is secured 24 hours a day by the USCP.  Restrictions
15 around the U.S. Capitol include permanent and temporary security barriers and posts
16 manned by the USCP.  Only authorized people with appropriate identification are allowed
17 access inside the U.S. Capitol.

18       8.    On January 6, 2021, a joint session of the United States Congress was
19 scheduled to convene at the U.S. Capitol to certify the vote count of the Electoral College
20 of the 2020 Presidential Election, which took place on November 3, 2020
21 ("Certification"). The exterior plaza of the U.S. Capitol was closed to members of the
22 public.

23       9.    A crowd began to assemble near the Capitol around 12:30 p.m. Eastern
24 Standard Time (EST), and at about 12:50 p.m., known and unknown individuals broke
25 through the police lines, toppled the outside barricades protecting the U.S. Capitol, and
26 pushed past USCP and supporting law enforcement officers there to protect the U.S.
27 Capitol.

28 AFFIDAVIT OF TONYA GRIFFITH - 3
    USAO 20201R00126

10.     The joint session began at approximately 1:00 p.m. in the House Chamber.

11.     At approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Michael Pence was present and presiding, first in the joint session, and then in the Senate chamber.  Also around this time, the USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building, in part because of a suspicious package found nearby.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

12.     As the proceedings continued in both the House and the Senate, the USCP attempted to keep the crowd away from the Capitol building and the proceedings underway inside. Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

13.     At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over additional barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by USCP officers or other authorized security officials. At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

14.     At about 2:10 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.  Publicly available video

AFFIDAVIT OF TONYA GRIFFITH - 4
USAO 20201R00126

footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



15.     Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers.  That is, at or about this time, the USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down.  The USCP ordered a similar lockdown in the House chamber.  As rioters attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside.

16.     At approximately 2:30 p.m., known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building.  Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted

AFFIDAVIT OF TONYA GRIFFITH - 5
USAO 20201R00126

1
2   federal police officers.  Many of the federal police officers were injured, several were
3   admitted to the hospital, and at least one federal police officer died as a result of the
4   injuries he sustained.  The subjects also confronted and terrorized members of Congress,
5   Congressional staff, and the media.  The subjects carried weapons including tire irons,
6   sledgehammers, bear spray, and tasers.  They also took police equipment from overrun
7   police, including shields and police batons.  At least one of the subjects carried a handgun
8   with an extended magazine.  These actions by the unknown individuals resulted in the
9   disruption and ultimate delay of the vote Certification.

10          17.    Also at approximately 2:30 p.m., as subjects reached the rear door of the
11  House Chamber, USCP ordered the evacuation of lawmakers, Vice President Pence, and
12  president pro tempore of the Senate Charles Grassley, for their safety.

13          18.    At around 2:45 p.m., subjects broke into the office of House Speaker Nancy
14  Pelosi. At about the same time, one subject was shot and killed while attempting to break
15  into the House chamber through the broken windows.

16          19.    At around 2:47 p.m., subjects broke into the United States Senate Chamber.
17  Publicly available video shows an individual asking, "Where are they?" as they opened
18  up the door to the Senate Chamber.  Based upon the context, law enforcement believes
19  that the word "they" is in reference to members of Congress

20
21
22
23
24
25
26
27
28  AFFIDAVIT OF TONYA GRIFFITH - 6
    USAO 20201R00126

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



A Reporter's Footage from Inside the Capitol Siege

Where are they?

▶  4:07/12:32    THE NEW YORKER

20.     After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.

AFFIDAVIT OF TONYA GRIFFITH - 7
USAO 20201R00126



21.     An unknown subject left a note on the podium on the floor of the Senate Chamber.  This note, captured by the filming reporter, stated "It's Only A Matter of Time Justice is Coming."

AFFIDAVIT OF TONYA GRIFFITH - 8
USAO 20201R00126

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13



14      22.    During the time when the subjects were inside the Capitol building,
15   multiple subjects were observed inside the U.S. Capitol wearing what appears to be,
16   based upon my training and experience, tactical vests and carrying flex cuffs.  Based
17   upon my knowledge, training, and experience, I know that flex cuffs are a manner of
18   restraint that are designed to be carried in situations where a large number of individuals
19   were expected to be taken into custody.
20
21
22
23
24
25
26
27
28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970





23.    At around 2:48 p.m., DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m.

AFFIDAVIT OF TONYA GRIFFITH - 10
USAO 20201R00126

1

2     24.    At about 3:25 p.m., law enforcement officers cleared the Senate floor.

3     25.    Between 3:25 and around 6:30 p.m., law enforcement was able to clear the

4  U.S. Capitol of all of the subjects.

5     26.    Based on these events, all proceedings of the United States Congress,

6  including the joint session, were effectively suspended until shortly after 8:00 p.m. the

7  same day.  In light of the dangerous circumstances caused by the unlawful entry to the

8  U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol

9  without any security screening or weapons check, Congressional proceedings could not

10 resume until after every unauthorized occupant had left the U.S. Capitol, and the building

11 had been confirmed secured.  The proceedings resumed at approximately 8:00 pm after

12 the building had been secured.  Vice President Pence remained in the United States

13 Capitol from the time he was evacuated from the Senate Chamber until the session

14 resumed.

15    27.    Beginning around 8:00 p.m., the Senate resumed work on the Certification.

16    28.    Beginning around 9:00 p.m., the House resumed work on the Certification.

17    29.    Both chambers of Congress met and worked on the Certification within the

18 Capitol building until approximately 3:00 a.m. on January 7, 2021.

19    30.    During national news coverage of the aforementioned events, video footage

20 which appeared to be captured on mobile devices of persons present on the scene

21 depicted evidence of violations of local and federal law, including scores of individuals

22 inside the U.S. Capitol building without authority to be there.

23    31.    Based on my training and experience, I know that it is common for

24 individuals to carry and use their cell phones during large gatherings, such as the

25 gathering that occurred in the area of the U.S. Capitol on January 6, 2021.  Such phones

26 are typically carried at such gatherings to allow individuals to capture photographs and

27 video footage of the gatherings, to communicate with other individuals about the

28  AFFIDAVIT OF TONYA GRIFFITH - 11                    UNITED STATES ATTORNEY
    USAO 20201R00126                                    700 STEWART STREET, SUITE 5220
                                                         SEATTLE, WASHINGTON 98101
                                                              (206) 553-7970

gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

32.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity.  It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property.  As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

33.     Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot.  In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos.

AFFIDAVIT OF TONYA GRIFFITH - 12
USAO 20201R00126

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16
17
18
19
20
21
22
23
24
25



26
27

¹ https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/

28

AFFIDAVIT OF TONYA GRIFFITH - 13
USAO 20201R00126

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12



***JOHNATAKIS'S ACTIONS AT THE CAPITOL***

13    34.    On January 16, 2021, the FBI posted a Be-On-The-Lookout ("BOLO")

14  Photograph 103 (hereinafter "the man in BOLO 103" or "BOLO 103") to its website

15  seeking the public's assistance identifying the individuals who made unlawful entry into

16  the United States Capitol Building and assaulted federal law enforcement personnel.[4] As

17  captured on D.C. Metropolitan Police Department ("MPD") Body Worn Camera

18  ("BWC"), on January 6, 2021, the man in BOLO 103 picked up a gate and pushed it into

19  police officers in an apparent attempt to gain access to the Capitol grounds and building.

20  The BOLO is depicted below:

21
22
23
24

[2]https://www.businessinsider.com/republicans-objecting-to-electoral-votes-in-congress-live-updates-
25  2021-1.
    [3]https://www.thv11.com/article/news/arkansas-man-storms-capitol-pelosi/91-41abde60-a390-4a9e-b5f3-
26  d80b0b96141e
    [4]  This  bulletin  is  publicly  available:  https://www.fbi.gov/wanted/seeking-info/violence-at-the-united-
27  states-capitol-13

28  AFFIDAVIT OF TONYA GRIFFITH - 14
    USAO 20201R00126

**ASSAULT ON FEDERAL OFFICERS AND VIOLENCE AT THE UNITED STATES CAPITOL**

WASHINGTON, D.C.
JANUARY 6, 2021

35.     More specifically, BOLO 103 stands with a large group of individuals located outside of the Capitol building, but on the Capitol grounds (the West Terrace). Looking at the BWC, BOLO 103 is at the front of the crowd, directly in front of a line of MPD officers.  Between the officers and BOLO 103 is a metal police barricade.  At some point, BOLO 103, who's using some sort of bullhorn-type device, instructs the crowd to use their bodies to push the gate back [into police] by one foot. BOLO 103 then counts, "1, 2, 3 go." Several individuals join BOLO 103 by putting their hands on the metal barricade.  Then, along with other members of the crowd, they use their collective force to shove the barrier into the police officers. The group then lifts the barrier up in an apparent attempt to break through the police line by ducking under the barrier. In response to the physical aggression, MPD officers took defensive postures and used chemical irritants to stop the group from breaking through the line of officers.

36.     In the days immediately following the events of January 6, the FBI received several tips from the public that TAYLOR JAMES JOHNATAKIS of Kingston,

AFFIDAVIT OF TONYA GRIFFITH - 15
USAO 20201R00126

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Washington participated in the Capitol Riots. The various tips discussed below were received by the FBI before BOLO 103 was published. Therefore, none of the tipsters identified JOHNATAKIS as BOLO 103 beforehand. The tips addressed his general presence, as well as claims on social media that he had led a group.

37.     On January 7, 2021, a tipster ("T-1") contacted the FBI and stated that T-1 had viewed social media posts by JOHNATAKIS in which JOHNATAKIS claimed to have led one of the charges against the police barricades which led to the infiltration of the Capitol Building on January 6, 2021.   T-1 provided several screenshots from JOHNATAKIS's Facebook page, as well as a video posted by JOHNATAKIS. In the video, JOHNATAKIS declares:

> If there were ANTIFA they sprinkled in right along with us because we got the same mission and that was to take that Capitol and for the first time since 1817, that Capitol was stormed and taken. They had to run Congressmen and Senators out of the Capitol with black bags over their heads. Black bags. Why black bags?  Black bags because the crowd was so irate we probably would have murdered a few of them had we seen exactly who they were. . . the cops just murdered one of us within an hour of showing up. An hour.  They are that afraid of us . . . I got gassed. I got hit pretty dang hard a couple of times with a nightstick. It was not funny it hurt.  We're done.  I'm walking away from the Capitol . . . I am very sad about what I have watched firsthand unfold. . . I was on the frontline. I was on the gate.  I organized a push up to the Capitol because I felt like that is exactly what we needed.

38.     In one of the screenshots provide by T-1, JOHNATAKIS posted on Facebook that he was at the Capitol, that he was "gassed" and "beat" and that "They let Antifa in." In another screenshot provided by T-1, JOHNATAKIS posted to his Facebook account the image below, which appears to be a "selfie"[5] taken using a cellular phone:

---

[5] A "selfie" is a self-portrait photograph, typically taken with a digital camera or smartphone which may be held in the hand.  Selfies are often shared on social media, via social networking services such as Facebook, Twitter, Snapchat, and Instagram.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17




**Taylor Johnatakis**
On the ground 90% of the crowd had zero idea what was happening. The cell towered were pretty much jammed.

I would say 99% of the crowd didn't even know people had made it in, till after.

From everything I tell Antifa was let into the capital to make show.

Maga was blocked, once Antifa got their pictures, they shot a maga girl and cleared the building.

18    39.    A different tipster ("T-2") also contacted the FBI.  In this tip, T-2 stated

19   that T-2 knew JOHNATAKIS since about 2007 and that they met in college.

20    40.    On January 10, 2021, the FBI interviewed T-2 telephonically. T-2 stated

21   that JOHNATAKIS hosts a podcast where he discusses deep state conspiracy theories.

22   T-2 explained that on the audio podcast, JOHNATAKIS went into detail about his

23   experience in Washington, D.C. on January 6, 2021.  The podcast was titled "My 1st

24   hand account on the front line in DC Jan 6."  T-2 told FBI agents that JOHNATAKIS

25   spoke of a revolution and taking back the Capitol, but JOHNATAKIS claimed that he did

26   not physically enter the Capitol Building. T-2 provided the link to the podcast recording.

27

28   AFFIDAVIT OF TONYA GRIFFITH - 17
USAO 20201R00126

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

41.     T-2 also stated that JOHNATAKIS had posted pictures and videos of his travel and time in Washington D.C. on January 5 and at the Capitol building on January 6, 2021, including a video in which JOHNATAKIS said that he had organized a group of people to break past the police barricade at the Capitol building and had acknowledged telling a group of people to move forward and push against the police line.[6]

42.     T-2 also identified several of JOHNATAKIS's social media accounts, including a Facebook account "taylor-johnatakis" and a Twitter account, "peasantspod." An open source review of JOHNATAKIS's Twitter account suggests that JOHNATAKIS may adhere to the QAnon ideology.[7]  On December 21, 2020, JOHNATAKIS posted the following to his Twitter Account:

_____

[6] T-1 and T-2 identify for FBI agents many of the same Facebook posts.

[7] QAnon is a sprawling, discredited, anti-establishment conspiracy theory that originated from postings on online message boards by an anonymous individual known as "Q." Q claims to be a high-level government official with a Q clearance and access to classified information. Central to the QAnon conspiracy theory is the false belief that the world is run by a cabal of Satan-worshipping pedophiles and child-traffickers (allegedly largely comprised of prominent Democratic politicians, so-called "Deep State" government employees, journalists, and Hollywood elite) and that President Trump is secretly working with Q and others to take down the cabal.  Many QAnon adherents (known as "Anons") refer to themselves as "digital soldiers" and believe they are engaged in an epic battle between good and evil and darkness and light.  Following the November 3, 2020 election, many QAnon adherents began pushing false and discredited theories of massive voter fraud and that the 2020 election had been "stolen" from President Trump.  Other prominent QAnon adherents exhorted the "Anons" to "trust the plan," believing that President-Elect Biden's victory is illusory and part of a convoluted plan by Q and others to reveal the crimes of the cabal to the world, resulting in President Trump securing a second term.  QAnon believers are waiting for two major events, which they refer to as the "the Storm" and the "Great Awakening." The "Storm" refers to a day of violence which will result in mass arrests, military trials, and executions of the members of the cabal.  According to QAnon lore, "the Storm", will be followed by the "Great Awakening," which generally refers to the belief that the truth of the central tenets of QAnon will be revealed to the world.

AFFIDAVIT OF TONYA GRIFFITH - 18
USAO 20201R00126

1

2

3

4

5

6

7



8    43.    On December 24, 2020, JOHNATAKIS tweeted "It's just a matter of time

9    before a call to arma (sic) Supreme Court sets Pennsylvania response date in Trump

10   election challenge for two days after Biden inauguration."

11   44.    On January 1, 2021, JOHNATAKIS retweeted a thread from Lin Wood,[8]

12   stating "thread on [fire emoji]….all I have to add is 'light em up!'".  That same day,

13   JOHNATAKIS retweeted a thread from Lin Wood stating "Them is fighting words….5

14   days." JOHNATAKIS's Twitter feed has numerous posts asserting that the election was

15   stolen from President Trump.

16   45.    On January 23, 2021, JOHNATAKIS made his Twitter account private.

17   46.    T-2 provided FBI agents with a video that JOHNATAKIS uploaded to his

18   Facebook account "taylor-johnatakis" on January 6, 2021 with the caption #stopthesteal.

19   In the video, JOHNATAKIS is walking in Washington, D.C. and states:

20        Trump's speech is over.  It was awesome. Some of you may have seen it
          online he went over all the voter fraud.  Uhh, I am very concerned about
21        Mike Pence. I have no idea what he is going to do.  I did not love the way
          the President talked about that.   And uhh, I don't know, we'll see.
22        Anyways, we're walking over to the Capitol right now and I don't know,
          maybe we will break down the doors.
23

24

25

26
─────────────
27   [8] Lin Wood, a prominent figure in the QAnon community, had his Twitter account permanently suspended by
     Twitter for violating Twitter's terms of service.

28
                                                          UNITED STATES ATTORNEY
                                                          700 STEWART STREET, SUITE 5220
                                                          SEATTLE, WASHINGTON 98101
                                                          (206) 553-7970

47.   On January 10, 2021 (before BOLO #103 was released), T-2 emailed an FBI agent and stated the following: "Here is the picture that the FBI posted.  I don't know if it's him, but the man in the second row from the top, second to the last picture on the right looks like Taylor." To that message, T-2 attached a photo pulled from an FBI bulletin. To your affiant's knowledge, the person T-2 identified in that bulletin is not JOHNATAKIS. Later, when shown BOLO 103, T-2 identified the individual as JOHNATAKIS.

48.   Finally, an additional tipster ("T-3") provided screen shots of social media accounts and several videos and audio recordings, including several videos of JOHNATAKIS chronicling his visit to D.C. and the same podcast recording mentioned by T-2. T-3 knows JOHNATAKIS through T-3's spouse.

49.   The FBI interviewed T-3 on January 12, 2021. Regarding the podcast, T-3 told FBI agents that JOHNATAKIS spoke about his experience on January 6, 2021. During that podcast (which FBI agents also listened to), JOHNATAKIS says that he never entered the building, hit anyone, or broke anything.

50.   As discussed above, and as depicted in the photo below, on January 6, 2021, JOHNATAKIS was wearing a red Make American Great Again Hat:

1
2
3
4
5
6
7
8
9
10
11
12
13



14   See MPD Officer 1's BWC.  MPD Officer 2 was standing near JOHNATAKIS. Starting
15   at around 8:02 of MPD Officer 2's video, JOHNATAKIS is waiving other rioters forward
16   toward the line of MPD officers.

17        51.     At approximately 8:46 of MPD Officer 1's BWC, JOHNATAKIS has a
18   bullhorn in his backpack and he can be heard yelling words to the effect of, "push them
19   out of here, we're just using our bodies," referencing the law enforcement officers who
20   are on the other side of the police barricade.

21
22
23
24
25
26
27
28   AFFIDAVIT OF TONYA GRIFFITH - 21
     USAO 20201R00126

1
2
3
4
5
6
7
8
9
10
11
12
13



14   52.    JOHNATAKIS then directs the other members of the crowd to push the
15   barricades against the MPD officers, yelling words to the effect of "one foot" and "1, 2, 3
16   go." JOHNATAKIS, along with members of the crowd, begin pushing the metal police
17   barricade.



18
19
20
21
22
23
24
25
26
27
28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11



12
13
14
15
16
17
18
19
20



21      53.     When looking at photos and videos that JOHNATAKIS himself posted on

22  January 6, 2021 to his Facebook account, JOHNATAKIS is wearing the same hat and

23  jacket captured in MPD Officer 1's and MPD Officer 2's BWC.

24      54.     Based on searches in public and law enforcement databases, JOHNATAKIS

25  was identified as Taylor James Johnatakis. DMV records provided JOHNATAKIS's date

26  of birth and confirmed his residential address, the SUBJECT PREMISES.

27

28  AFFIDAVIT OF TONYA GRIFFITH - 23
    USAO 20201R00126

55.    FBI Agents reviewed images of JOHNATAKIS in MPD BWC, JOHNATAKIS's DMV photograph, and the images and social media provided by T-1, T-2, and T-3. JOHNATAKIS's facial features in his social media photos and DMV photo match those of the individual in MPD Officer 1's BWC; they appear to be the same person.

56.    On Saturday, January 20, 2021, FBI Agents attempted contact with JOHNATAKIS at his residence in Kingston, Washington, the SUBJECT PREMISES. No one answered the door. A neighbor ("W-1") confirmed that JOHNATAKIS lives at the SUBJECT PREMISES and provided a phone number for him. JOHNATAKIS was then interviewed by the FBI by phone on January 21, 2021.  JOHNATAKIS admitted that he was at the Capitol on January 6, 2021, for approximately one hour.  JOHNATAKIS stated he did not enter the Capitol building, but did make it to the steps.  JOHNATAKIS claimed that he was "repelled with pepper spray," and then moved to a grassy location where he merely observed.  He denied knowledge that others were going to storm the Capitol building.  JOHNATAKIS stated he did not lead anyone past the barricades and he was not trying to be violent. JOHNATAKIS stated that he brought a backpack containing a bullhorn and camera equipment.  JOHNATAKIS stated he did not realize there was any violence at the Capitol until after he left, and claimed that all of the content on his social media and podcast relating to these events was "hyperbolic."

57.    On February 3, 2021, JOHNATAKIS contacted FBI agents again with questions about the FBI's interest in him.

58.    As described above, JOHNATAKIS used a mobile device to record videos of himself while walking to the Capitol building on January 6, 2021. Additionally, JOHNATAKIS used Facebook, an application typically used on mobile devices, to share the videos. Given JOHNATAKIS's continuous chronicling of the events at the U.S. Capitol, as well as his willingness to post on social media before, during, and after the

AFFIDAVIT OF TONYA GRIFFITH - 24
USAO 20201R00126

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

riot, it is likely that JOHNATAKIS was discussing the events with other individuals through cellular phone software and mobile applications.  Therefore, I have reason to believe that JOHNATAKIS's mobile devices, specifically his smart phone(s) and or cellular phone(s), contain evidence regarding his presence and conduct on the Capitol grounds, as well as his communications with others regarding these events.

59.    Both because the SUBJECT PREMISES is JOHNATAKIS's home of record and because individuals are rarely far away from their smart phone and/or cellular phone, investigators have reason to believe that the SUBJECT DEVICES are located at the SUBJECT PREMISES, that is, on the person of JOHNATAKIS or at the property located at 29628 Gamble Place NE, Kingston, Washington 98346.

60.    Based on my training and experience, and on conversations I have had with other law enforcement officers, I know that criminals and/or conspirators and individuals use smart phones and/or cellular phones, electronic mail ("e-mail"), and social media to conduct their illegal activity, to preserve and distribute photographs and videos in order to memorialize previous illegal activity, and to maintain contact with other confederates, conspirators, and criminal associates involved with the planning, targeting, and execution of their goals.  The discussion of the crimes described in this affidavit were captured, in part, on a cellular phone and/or smart phone device.

61.    Additionally, communication between JOHNATAKIS and other potential co-conspirators, including travel plans, is evidence of his motivation in the commission of the Target Offenses.  Digital artifacts and copies of these communications will likely remain on the mobile devices on which these communications occurred, including the SUBJECT DEVICES.

62.    Any devices located at the SUBJECT PREMISES belonging to JOHNATAKIS are likely to contain location information, including but not limited to geolocation data associated with photographs, which may identify a user's location

AFFIDAVIT OF TONYA GRIFFITH - 25
USAO 20201R00126

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

during a specific time period relevant to the Target Offenses such as during the breach of the Capitol.

63.     Based on my training and experience, and on conversations I have had with other law enforcement officers, I know that some individuals who participate in activities aimed at disrupting or interfering with governmental and/or law enforcement operations have been known to use anonymizing services and/or applications capable of encrypting communications to protect their identity and communications.  By using such tools, in some cases, the only way to see the content of these conversations is on the electronic device that had been used to send or receive the communications.

64.     Based on the foregoing, there is probable cause to believe that evidence related to the Target Offenses may be stored on the SUBJECT DEVICES.  The property to be searched includes digital devices, computers, laptops, mobile phones and other similar handheld communication devices.  The warrant applied for would authorize law enforcement to not only seize such devices that could contain evidence related to the Target Offenses, but also to search those devices for that evidence, as described in Paragraphs 1 and 2 of Attachment B.  That search may occur on or off-site, and the devices may be transported out of this District (because this case is being investigated by the D.C. U.S. Attorney's Office and FBI's Washington Field Office) for forensic examination.

65.     The SUBJECT PREMISES is also likely to contain evidence of JOHNATAKIS's presence at the U.S. Capitol on January 6, 2021.  For example, I would expect that his primary residence would have the items of clothing he wore that day, and that the equipment JOHNATAKIS used that day (e.g., the bullhorn and his backpack) would also likely be present on the premises (e.g., in a shed or in his residence).  I would also expect that, to the extent JOHNATAKIS has physical records of travel to and from

AFFIDAVIT OF TONYA GRIFFITH - 26
USAO 20201R00126

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Washington, D.C.—such as a boarding pass, itinerary, or other documents—those documents would also likely be in JOHNATAKIS's residence.

## SMART PHONES, CELL PHONES, AND ELECTRONIC STORAGE

66.     As described above and in Attachment B, this application seeks permission to search for (among other things) smart phone(s) and/or cellular phone(s), and certain other SUBJECT DEVICES, belonging to JOHNATAKIS that might be found on the SUBJECT PREMISES, as well as evidence, fruits, and/or instrumentalities of violations of the Target Offenses.  One form in which such evidence might be found is data stored on one or more digital devices such as the SUBJECT DEVICES.  Such devices include any electronic system or device capable of storing or processing data in digital form, including cellular phones and smart phones. Thus, the warrant applied for would authorize the seizure of the SUBJECT DEVICES (e.g., smart phone(s) and/or cellular phone(s) belonging to JOHNATAKIS) or, potentially, the copying of stored information, all under Rule 41(e)(2)(B).  As explained above, this warrant would also authorize the search of those SUBJECT DEVICES for the evidence described in Attachment B.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that, if smart phone(s) and/or cellular phone(s) (or other SUBJECT DEVICES) belonging to JOHNATAKIS are found on the SUBJECT PREMISES, there is probable cause to believe that the items described in Attachment B will be stored on those SUBJECT DEVICES for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that digital or electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium (such as a smart phone), deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or

no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a smart phone's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, smart phone storage media—in particular, smart phones' internal hard drives—contain electronic evidence of how a smart phone has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Smart phone users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

67.  Because several people could share the residence in the SUBJECT PREMISES, it is possible that the SUBJECT PREMISES will contain storage media that

AFFIDAVIT OF TONYA GRIFFITH - 28
USAO 20201R00126

are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  This search authorizes the seizure and search of digital devices and electronic storage media to the extent law enforcement determines that it is possible that the things described in this warrant could be found on those devices—that is, that it is possible that JOHNATAKIS owns or has access to that digital device or electronic storage medium.

68.    As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the SUBJECT DEVICES were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the SUBJECT DEVICES at issue here because:

a.    Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the SUBJECT DEVICES are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.  Digital data stored in the SUBJECT DEVICES, not currently

associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.  Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be

AFFIDAVIT OF TONYA GRIFFITH - 30
USAO 20201R00126

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.  A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.  I know that when an individual uses a digital device, such as the SUBJECT DEVICES, to participate in activities aimed at disrupting or interfering with governmental and/or law enforcement operations, the individual's device will generally serve both as an instrumentality for

AFFIDAVIT OF TONYA GRIFFITH - 31
USAO 20201R00126

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

committing the crime, and also as a storage medium for evidence of the crime.  The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The digital device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

69.    Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.   Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain

AFFIDAVIT OF TONYA GRIFFITH - 32
USAO 20201R00126

specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c. Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

AFFIDAVIT OF TONYA GRIFFITH - 33
USAO 20201R00126

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

d. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are

AFFIDAVIT OF TONYA GRIFFITH - 34
USAO 20201R00126

not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

e. Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

AFFIDAVIT OF TONYA GRIFFITH - 35
USAO 20201R00126

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

f. Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

70. The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the SUBJECT PREMISES. Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

a. Upon securing the SUBJECT PREMISES, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any digital devices (that is, the Device(s)), within the scope of this warrant as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review. For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such digital devices at the SUBJECT PREMISES. The

1
2       digital devices, and/or any digital images thereof created by law
3   enforcement sometimes with the aid of a technical expert, in an
4   appropriate setting, in aid of the examination and review, will be
5   examined and reviewed in order to extract and seize the information,
6   records, or evidence described in Attachment B.

7      b. The analysis of the contents of the digital devices may entail any or all
8   of various forensic techniques as circumstances warrant.   Such
9   techniques may include, but shall not be limited to, surveying various
10  file "directories" and the individual files they contain (analogous to
11  looking at the outside of a file cabinet for the markings it contains and
12  opening a drawer believed to contain pertinent files); conducting a file-
13  by-file review by "opening," reviewing, or reading the images or first
14  few "pages" of such files in order to determine their precise contents;
15  "scanning" storage areas to discover and possibly recover recently
16  deleted data; scanning storage areas for deliberately hidden files; and
17  performing electronic "keyword" searches through all electronic
18  storage areas to determine whether occurrences of language contained
19  in such storage areas exist that are related to the subject matter of the
20  investigation.

21     c. In searching the digital devices, the forensic examiners may examine as
22  much of the contents of the digital devices as deemed necessary to
23  make a determination as to whether the contents fall within the items to
24  be seized as set forth in Attachment B.   In addition, the forensic
25  examiners may search for and attempt to recover "deleted," "hidden,"
26  or encrypted data to determine whether the contents fall within the
27  items to be seized as described in Attachment B.   Any search

28  AFFIDAVIT OF TONYA GRIFFITH - 37
    USAO 20201R00126

1

2      techniques or protocols used in searching the contents of the seized

3      digital devices will be specifically chosen to identify the specific items

4      to be seized under this warrant.

5  ///

6  ///

7  ///

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  AFFIDAVIT OF TONYA GRIFFITH - 38
    USAO 20201R00126

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## **CONCLUSION**

71.     I submit that this affidavit supports probable cause for a warrant to search the SUBJECT PREMISES—including JOHNATAKIS's person, wherever he is found— as described in Attachment A, and to seize the items described in Attachment

_____

TONYA GRIFFITH, Affiant
SPECIAL AGENT, FBI

The above-named agent provided a sworn statement to the truth of the foregoing affidavit by telephone on the 4th day of February, 2021.

_____

David W. Christel
United States Magistrate Judge

AFFIDAVIT OF TONYA GRIFFITH - 39
USAO 20201R00126

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2

## **ATTACHMENT A**

3

*Property to be searched*

4

The property to be searched is all of the following (collectively, the "SUBJECT

5

PREMISES"):

6

1.      The person of TAYLOR JAMES JOHNATAKIS, wherever he is found.

7

2.      The property at 29628 Gamble PL NE, Kingston, Washington 98346,

8

including a single family home depicted in the photograph below.

9

10

11

12

13

14

15

16

17



18

19

20

21

22

23

Authority to search extends to all parts of the SUBJECT PREMISES, including

24

the main structure, garage(s), storage structures, outbuildings, and curtilage, and all

25

vehicles, containers, compartments, or safes located on the property, whether locked or

26

not, where the items described in Attachment B could be found.

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT B**

*Property to be seized*

1.     The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. § 1512(c)(2) (obstruction of Congress); 111(a)(1) (assaulting a federal agent); 231(a)(3) (civil disorders), 371 (conspiracy); 372 (conspiracy to impede or injure officer); 2101 (interstate travel to participate in riot); 1752(a)(1),(2), and (4) (unlawful entry on restricted buildings or grounds); and Title 40 U.S.C. Section 5104(e)(2) (E) and (F) (violent entry, disorderly conduct, and other offenses on capitol grounds) (the "Target Offenses") that have been committed by Taylor James Johnatakis ("JOHNATAKIS") as described in the search warrant affidavit; including, but not limited to:

   a.  Evidence concerning planning to unlawfully enter the U.S. Capitol, including any maps or diagrams of the building or its internal offices;

   b.  Evidence concerning the breach and unlawful entry into the U.S. Capitol, including any property of the U.S. Capitol, and any conspiracy or plan to do so, on January 6, 2021;

   c.  Evidence concerning travel to or from Washington, D.C., within two months prior to or after January 6, 2021;

   d.  Evidence concerning the assaults of federal officers/agents and efforts to impede such federal officers/agents in the performance of their duties the United States Capitol on January 6, 2021;

   e.  Evidence concerning efforts after the fact to conceal evidence of the Target Offenses, or to flee prosecution for the same;

   f.  Evidence of the state of mind of the subject and/or other co-conspirators, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation;

g. Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

h. Clothing or other items worn or carried by JOHNATAKIS on or around January 5, 2021 to January 7, 2021, including the clothing, backpack, and bullhorn, depicted in the images and videos described in the search warrant affidavit; and

i. Clothing and other articles that reflect evidence of having participated in the unlawful activity at the U.S. Capitol, including evidence of pepper spray or other non-lethal crowd control remnants.

2. For any digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities described in paragraph 1 of this Attachment above, specifically including any smart phone(s) and/or cellular phone(s) belonging to JOHNATAKIS, hereinafter the "SUBJECT DEVICES":

a. evidence of who used, owned, or controlled the SUBJECT DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

b. evidence of software, or the lack thereof, that would allow others to control the SUBJECT DEVICES, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the attachment to the SUBJECT DEVICES of other storage devices or similar containers for electronic evidence;

d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the SUBJECT DEVICES;

e. evidence of the times the SUBJECT DEVICES was used;

f.  passwords, encryption keys, and other access devices that may be necessary to access the SUBJECT DEVICES;

g.  documentation and manuals that may be necessary to access the SUBJECT DEVICES or to conduct a forensic examination of the SUBJECT DEVICES;

h.  records of or information about Internet Protocol addresses used by the SUBJECT DEVICES; and

i.  records of or information about the SUBJECT DEVICES' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

To be clear, this warrant also authorizes law enforcement agents to review and search (on or off-site) the SUBJECT DEVICES for the fruits, evidence, information, contraband, or instrumentalities described in paragraph 1 of this Attachment above without seeking additional authorization to do so.

THE SEIZURE OF DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE MEDIA AND/OR THEIR COMPONENTS AS SET FORTH HEREIN IS SPECIFICALLY AUTHORIZED BY THIS SEARCH WARRANT, NOT ONLY TO THE EXTENT THAT SUCH DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE MEDIA CONSTITUTE INSTRUMENTALITIES OF THE CRIMINAL ACTIVITY DESCRIBED ABOVE, BUT ALSO FOR THE PURPOSE OF THE CONDUCTING OFF-SITE EXAMINATIONS OF THEIR CONTENTS FOR EVIDENCE, INSTRUMENTALITIES, OR FRUITS OF THE AFOREMENTIONED CRIMES